**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **NETTIE CROOMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:21-cv-36-CWB** |
| | ) | |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

**I.      Introduction and Administrative Proceedings**

Nettie Crooms ("Plaintiff") filed an application for Disability Insurance Benefits under Title II of the Social Security Act and an application for Supplemental Security Income under Title XVI of the Social Security Act on December 12, 2018—alleging disability onset as of September 4, 2016 due to fibromyalgia, fractured vertebrae in back, fractured vertebrae in neck, degenerative joint disease, manic depressive, edema, heart problems, and lung problems.  (Tr. 10, 80, 92, 103-04).[2]  Plaintiff's claims were denied at the initial level on February 12, 2019 (Tr. 10, 110, 116), and Plaintiff requested *de novo* review by an administrative law judge ("ALJ") (Tr. 122, 124).  The ALJ subsequently heard the case on July 28, 2020, at which time testimony was given by Plaintiff (Tr. 10, 39-56) and by a vocational expert (Tr. 55, 57-59).  The ALJ took the matter under advisement and issued a written decision on October 8, 2020 that found Plaintiff not disabled.  (Tr. 10-28).

---

[1]  Kilolo Kijakazi became Acting Commissioner for the Social Security Administration on July 9, 2021 and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

[2]  References to pages in the transcript are denoted by the abbreviation "Tr."

The ALJ's written decision contained the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2. The claimant has not engaged in substantial gainful activity since September 4, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: status post vertebral fractures at C3, T9, and T11, cervical degenerative disc disease, thoracic degenerative disc disease, osteoarthritis of the knees status post bilateral meniscal repair, obesity, chronic obstructive pulmonary disease (hereinafter "COPD"), and asthma (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for the following. This claimant cannot climb ladders, ropes, or scaffolding, but can occasionally climb ramps and stairs. She can occasionally kneel, stoop, crouch, and/or crawl. She cannot work in concentrated exposure to extreme cold or wetness. She cannot work exposed to pulmonary irritants.

6. The claimant is capable of performing past relevant work as an audit clerk and fabric inspector. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from September 4, 2016, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 13, 18, 19, 25, 27).  On November 23, 2020, the Appeals Council denied Plaintiff's request

for review (Tr. 1-5), thereby rendering the ALJ's decision the final decision of the Commissioner.

*See, e.g., Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

On appeal, Plaintiff asks the court to remand the case for a new hearing and further consideration.  (Doc. 18 at pp. 15-16).  The court finds the case to be ripe for review pursuant to 42 U.S.C. § 405(g); specifically, the court construes Plaintiff's supporting brief (Doc. 18) as a motion for summary judgment and the Commissioner's opposition brief (Doc. 19) as a competing motion for summary judgment.  Upon consideration of the parties' submissions, the relevant law, and the record as a whole, the court concludes that Plaintiff's motion for summary judgment is due to be denied, that the Commissioner's motion for summary judgment is due to be granted, and that the final decision is due to be affirmed.[3]

## II.    Standard of Review and Regulatory Framework

The court's review of the Commissioner's decision is a limited one.  Assuming the proper legal standards were applied by the ALJ, the court is required to treat the ALJ's findings of fact as conclusive so long as they are supported by substantial evidence.  42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla," but less than a preponderance, "and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) ("Even if the evidence preponderates against the Commissioner's findings, [a reviewing court] must affirm if the decision reached is supported by substantial evidence.") (citations omitted).  The court thus may reverse the ALJ's decision only if it is convinced that the decision was not supported by substantial evidence or that the proper legal standards were not applied.  *See Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  Reversal is not warranted simply because the court itself would have reached a result contrary to that of the factfinder.  *See*

---

[3] As contemplated by 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties have consented to the exercise of full jurisdiction by a United States Magistrate Judge. (Docs. 5 & 6).

*Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).  Despite the deferential nature of its review, however, the court must look beyond those parts of the record that support the decision, must view the record in its entirety, and must take account of evidence that detracts from the evidence relied on in the decision.  *See Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *see also Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

To qualify for disability benefits and establish entitlement for a period of disability, a person must be unable to:

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).[4]  To make such a determination, the ALJ employs a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520 & 416.920.

(1) Is the person presently unemployed?

(2) Is the person's impairment severe?

(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1 [the Listing of Impairments]?

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

---

[4] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[5]

The burden of proof rests on the claimant through step four.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004); *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). A claimant establishes a *prima facie* case of a qualifying disability once he or she has carried the burden of proof from step one through step four.  *Id*.  At step five, the burden shifts to the Commissioner, who must then show that there are a significant number of jobs in the national economy that the claimant can perform.  *Id*.

In order to assess the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC").  *Phillips*, 357 F.3d at 1238-39.  The RFC is what the claimant is still able to do despite the claimant's impairments and is based on all relevant medical and other evidence.  *Id*.  It may contain both exertional and nonexertional limitations.  *Id*. at 1242-43.  At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy that the claimant can perform.  *Id*. at 1239.  To do so, the ALJ can use either the Medical Vocational Guidelines ("grids"), *see* 20 C.F.R. pt. 404 subpt. P, app. 2, or call a vocational expert ("VE").  *Id*. at 1239-40.  The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience.  Each factor can independently limit the number of jobs realistically available to an individual, and combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled."  *Id*. at 1240.

---

[5] *McDaniel* is an Supplemental Security Income case.  Nonetheless, the same sequence applies to claims for Disability Insurance Benefits brought under Title II.  Cases arising under Title XVI therefore are appropriately cited as authority in Title II cases, and vice versa.  *See, e.g., Ware v. Schweiker*, 651 F.2d 408, 412 (5th Cir. 1981); *Smith v. Comm'r of Soc. Sec.*, 486 F. App'x 874, 876 n.* (11th Cir. 2012) ("The definition of disability and the test used to determine whether a person has a disability is the same for claims seeking disability insurance benefits or supplemental security income.").

**III.    Issues on Appeal**

Plaintiff raises three issues on appeal: (1) whether the ALJ erred by finding that she could return to her past relevant work; (2) whether there is new and material evidence requiring remand under sentence six of section 405(g); and (3) whether the ALJ improperly applied the Eleventh Circuit pain standard.  (Doc. 18 at p. 1).

**IV.    Discussion**

**A.    Return to Past Relevant Work**

At step four of the sequential evaluation process, the ALJ will consider a claimant's RFC and the claimant's past relevant work to determine whether the claimant "can still engage in the kind of gainful employment that [the claimant] has undertaken in the past." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018); 20 C.F.R. § 404.1520(a)(4)(iv).  "At step four, the claimant carries a heavy burden of showing that his impairment prevents him from performing his past relevant work."  *Id*.  "The claimant bears the burden of showing that he cannot perform his past work as he actually performed it and as it is generally performed in the national economy." *Simpson v. Com'r of Soc. Sec.*, 423 F. App'x 882, 884 (11th Cir. 2011) (citing SSR 82-61, 1982 WL 31387 at *1-2 (S.S.A. Jan. 1, 1982) and *Jackson v. Bowen*, 801 F.2d 1291, 1293-94 (11th Cir. 1986)); *Waldrop v. Comm'r of Soc. Sec.*, 379 F. App'x 948, 953 (11th Cir. 2010) ("[I]t is the claimant's burden to demonstrate not only that she can no longer perform her past relevant work as she actually performed it, but also that she can no longer perform this work as it is performed in the general economy."); *Cantu v. Comm'r of Soc. Sec.*, No. 2:19-CV-832, 2021 WL 960686 at *4 (M.D. Fla. Mar. 15, 2021).  Thus, "[i]f the ALJ finds that the claimant cannot perform the functional demands and duties of her past job as she actually performed it, he will consider whether the claimant can perform the functional demands and duties of the occupation as generally

6

required by employers throughout the national economy." *Scharber v. Comm'r of Soc. Sec.*, 411 F. App'x 281, 282 (11th Cir. 2011).

In considering whether a claimant can return to the claimant's past relevant work, "[t]he ALJ must take all the duties of a claimant's past work into consideration and evaluate whether the claimant can still perform them in spite of the severe impairment or combination of impairments." *McCormick v. Soc. Sec. Admin., Com'r*, 619 F. App'x 855, 858 (11th Cir. 2015); *Lucas v. Sullivan*, 918 F.2d 1567, 1574 n.3 (11th Cir. 1990). For such purposes, "[t]he claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work." SSR 82-62, 1982 WL 31386 at *3 (S.S.A. Jan. 1, 1982); *Cantu*, 2021 WL 960686 at *4. However, "[t]he ALJ may rely on information contained in the Dictionary of Occupational Titles (DOT) to determine whether a claimant can perform his past relevant work." *Rivera-Cruzada v. Comm'r of Soc. Sec.*, 741 F. App'x 737, 739 (11th Cir. 2018). As Social Security Ruling 00-4p explains, the SSA "rel[ies] primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy. [The SSA] use[s] these publications at steps 4 and 5 of the sequential evaluation process." SSR 00-4P, 2000 WL 1898704 at *2 (S.S.A. Dec. 4, 2000). "Similarly, [20 C.F.R. § 404.1566(d)] explicitly names the DOT as one of the main sources of jobs data the SSA relies on, and provides that ALJs 'will take administrative notice of reliable job information available' in the DOT. This subsection places the DOT first in its list of reliable government sources. What's more, other SSA Rulings describe the DOT as 'authoritative.' Plainly the DOT is integral to disability hearings." *Washington*, 906 F.3d at 1364-65 (citations omitted).

"The ALJ may also rely on the testimony of a VE, 'an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments.'"  *Rivera-Cruzada*, 741 F. App'x at 739 (citation omitted); SSR 00-4P, 2000 WL 1898704 at *2; 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2) ("We will ask you for information about work you have done in the past. We may also ask other people who know about your work.  ...  We may use the services of vocational experts or vocational specialists, or other resources, such as the 'Dictionary of Occupational Titles' and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity.").  Nonetheless, "[g]enerally, vocational expert testimony is not necessary to determine whether a claimant can perform his past relevant work."  *Hernandez v. Comm'r of Soc. Sec.*, 433 F. App'x 821, 823 (11th Cir. 2011) (citing *Lucas*, 918 F.2d at 1573 n.2); *Coley v. Comm'r of Soc. Sec.*, 771 F. App'x 913, 918 (11th Cir. 2019) ("The testimony of a vocational expert is only required to determine whether the claimant's RFC permits her to do other work after she has met her initial burden of showing that she cannot do past work.").

Here, the ALJ found that Plaintiff was capable of performing past relevant work as an inventory audit clerk[6] and as a fabric inspector and that such work did not require the performance of work-related activities precluded by her RFC.  (Tr. 25).  The ALJ stated the following:

> The undersigned reviewed the entries in the Dictionary of Occupational Titles cited above. The undersigned first considered the fabric inspector position, both as actually and customarily performed. At this job, the claimant reported supervising twenty other workers, five each night. They wove fabric for umbrellas and other miscellaneous items. She reported two hours of walking, standing, stooping,

---

[6] The ALJ refers to this position as "audit clerk."  (Tr. 26).  The technical job title for DICOT 219.387-030 is "stock control clerk" but is also known as "inventory clerk," inventory control clerk," or "stock order lister."  The court will refer to the position as inventory audit clerk, the term used by the VE.  (Tr. 58).

reaching, and bending. She reported spending two hours on paperwork each day. She recalled lifting forty-pound spools once per hour. The Dictionary entry on this position does not account for such activity, which would approach medium exertion. However, the claimant, through representation, agreed that such jobs appeared to be the appropriate identification for past work. The Dictionary position was entirely consistent with the light residual functional capacity assigned. It refers to activities such as examining, measuring, spreading, trimming, marking, folding, and stacking various fabric-crafted articles. The undersigned concludes this position can be performed as *customarily* performed.

The second job, auditor, was more consistent between the claimant's characterizations and the Dictionary entry. She reported lifting and carrying up to ten pounds at the most. This is generally consistent with, and even less demanding than, the position in the Dictionary. The Dictionary entry was entirely consistent with the residual functional capacity assigned. On her worksheet, the claimant listed "8" hours each for all walking, standing, reaching, crouching, and crawling (Exhibit B4E). This was unspecific and ambiguous. The preceding narrative description suggested a typical day never involved postural activities lasting eight hours. Instead, it simply referred to counting items at a store from inventory. It was unspecific on the type or extent of kneeling, crawling, or crouching needed. Hearing testimony was also not consistent with up to eight hours of any postural activities. She testified counting inventory at 14 stores each month. The claimant's earlier reports appear to state that she could be expected to engage in postural activities from time to time *across* each eight-hour day. This testimony and written characterization appear[] consistent with the Dictionary entry. That entry references compiling stock data and completing accounting reports for purposes of maintaining inventory. The undersigned finds the claimant could perform this job as actually *and* customarily performed.

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed.

(Tr. 27) (emphasis in original).  Plaintiff's RFC limited her to performing light work and included that she could not climb ladders, ropes, or scaffolding but could occasionally climb ramps and stairs, that she could occasionally kneel, stoop, crouch, and/or crawl, that she could not work in concentrated exposure to extreme cold or wetness, and that she could not work exposed to pulmonary irritants.  (Tr. 19).  In relying on the VE's testimony, the ALJ confirmed with the VE that the VE's testimony was consistent with the DOT.  (Tr. 56).

Plaintiff disputes the ALJ's statement that "the claimant, through representation, agreed that such jobs appeared to be the appropriate identification for past work" (Tr. 27), arguing that neither she nor her attorney expressed such an agreement at the hearing.  (Doc. 18 at p. 6).  The Commissioner contends that "Plaintiff did not question whether her prior work as a fabric inspector or audit clerk was past relevant work, either when the ALJ elicited testimony about it, or when the VE described and characterized her prior work as a fabric inspector and inventory audit clerk, or when the VE testified that she could perform this past work given her RFC."  (Doc. 19 at p. 4).  In reply, Plaintiff argues that she, through her attorney, agreed only that her testimony and description of her past relevant work were accurate, not the VE's testimony or the ALJ's ultimate findings that were based on the VE's testimony.  (Doc. 23 at p. 3).  Plaintiff asserts that "[a]ny agreement given by counsel regarding the ALJ's description of the Fabric Inspector and Inventory Audit Clerk positions was given in the context of [her] answers to the questions previously asked by the ALJ" and that the "VE's response and the descriptions of her past relevant work ultimately adopted by the ALJ were never agreed to by [her] or through her counsel."  (*Id.*).  Plaintiff argues that she is "specifically challenging the description and classification of her past work at Twitchell and Cannon Oil adopted by the ALJ."  (*Id.* at pp. 3-4).  Plaintiff's argument, however, ignores the ALJ's following statement:

> The undersigned asked the expert to consider an individual of the same age, education, experience and residual functional capacity as the claimant. **Considering such an individual, the expert testified that those two jobs were consistent with the residual functional capacity as generally and actually performed. There was no objection to any aspect of this testimony or to the vocational expert's qualifications. There was no cross-examination or request for clarification. There was no rebuttal testimony or submission of new contradictory evidence.** The expert's testimony is further well supported by the expert's education, training, experience and research, which also assisted in developing any opinions regarding hypothetical limitations falling outside the parameters of the Dictionary of Occupational Titles. Here there were none. The expert has subject matter specialization, familiarity with the standards used in the

sequential evaluation process, and a history of vocational analysis for the Administration.

(Tr. 26-27) (emphasis added).

At the hearing, the ALJ noted the exhibits in the administrative record, which included Plaintiff's work history report (Ex. B4E), and Plaintiff's attorney stated that no records were missing and that the administrative record was complete.  (Tr. 43).  Plaintiff testified that she worked for Cannon Oil for a number of years as an auditor, where she drove to different gas station convenience stores in various cities to count their inventory, view their videos, and keep their inventory in order.  (Tr. 44-45).  Plaintiff stated that she had a region to which she was assigned, consisting initially of about 14 stores, and that she visited each one of them once a month to do their inventory and check them.  (Tr. 45).  Plaintiff also worked at the company's home office, viewing videos, in addition to going out into the field.  (Tr. 45).  In her work history report, Plaintiff stated that she drove to each store, counted the inventory and entered the results into a computer, watched a video after each inventory count to determine any shortages, and completed daily paperwork.  (Tr. 243).  Plaintiff reported that she brought a counting machine and paperwork with her to each store.  (Tr. 243).  Plaintiff also testified that she had worked for Twitchell Corporation for a number of years where she started as a quality control operator and ended as a quality control supervisor supervising 20 quality control operators who quality controlled yarn to make fabric that was woven for umbrellas, awnings, and similar things.  (Tr. 45-46).  In her work history report, Plaintiff stated that she spent two hours daily doing paperwork and sitting.  (Tr. 246).  The ALJ informed Plaintiff that these jobs would be considered past relevant work, to which Plaintiff's attorney agreed.  (Tr. 46).

After hearing about Plaintiff's impairments and limitations, the ALJ introduced the VE. (Tr. 55).  Plaintiff's attorney did not object to the VE's qualifications.  (Tr. 55).  The VE testified

that her testimony was based upon her knowledge, education, training, and experience and was consistent with the DOT. (Tr. 56). The VE classified Plaintiff's past work into four jobs, which included the job as a fabric inspector, DICOT 789.587-014, 1991 WL 681235, and the job as an inventory audit clerk, DICOT 219.387-030, 1991 WL 671981. (Tr. 57-58). The VE stated that the fabric inspector job was a light[7] job with a specific vocational preparation time ("SVP") of 3, which was semi-skilled, and that the inventory audit clerk job was a light job with an SVP of 5, which was skilled. (Tr. 57-58). The ALJ then posed to the VE a hypothetical question in which the ALJ asked the VE to consider a claimant who was the same age and had the same education and past work experience as Plaintiff and was limited to the light exertional level, could not climb ladders, ropes, or scaffolds, could occasionally climb ramps or stairs, could occasionally stoop, kneel, crouch, or crawl, needed to avoid concentrated exposure to extreme cold or wetness, and needed to avoid exposure to pulmonary irritants, and whether with those limitations such individual could perform past work. (Tr. 58). The VE answered that the inventory audit clerk and the fabric inspector jobs would remain. (Tr. 59). The ALJ asked Plaintiff's attorney if there were any questions, and Plaintiff's attorney responded "no." (Tr. 59). Neither Plaintiff nor her attorney voiced any objections.

The record reflects that there was sufficient information about the demands of Plaintiff's past work. The ALJ considered Plaintiff's work history report, which was in the record at the time of the hearing, Plaintiff's testimony as to her past work, and the VE's assessment of Plaintiff's past work. The VE classified the fabric inspector job as light, semi-skilled labor, and the inventory

---

[7] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

audit clerk job as light, skilled labor, and referred the ALJ to the DOT codes for those jobs.  The DOT contained a detailed descriptions of the duties and physical requirements associated with each occupation as generally performed in the economy.  *See* DICOT 789.587-014, fabric inspector, 1991 WL 681235, and DICOT 219.387-030, inventory audit clerk, 1991 WL 671981. Because the ALJ relied on Plaintiff's work history report, the testimonies of Plaintiff and the VE, and the DOT descriptions, the court finds that the ALJ and the VE appropriately classified Plaintiff's past relevant work.  *Holder v. Soc. Sec. Admin.*, 771 F. App'x 896, 900 (11th Cir. 2019) (The ALJ appropriately relied on the claimant's testimony, her work history report, vocational expert testimony, and DOT descriptions to "paint a full picture of [the claimant's] past relevant work work—both as she performed it herself, and as it is generally performed."); *Sexton v. Soc. Sec. Admin., Comm'r*, No. 4:21-CV-00624, 2022 WL 4236629 at *10 (N.D. Ala. Sept. 14, 2022) ("Because the ALJ relied upon [plaintiff's] hearing testimony, the vocational expert's testimony, and the DOT classifications, the court finds she obtained sufficient information to appropriately classify [plaintiff's] past relevant work."); *Savor v. Shalala*, 868 F. Supp. 1363, 1365 (M.D. Fla. 1994) ("[I]t is clear that the ALJ did determine the physical demands of the Plaintiff's past work and her ability to perform that work in light of her impairment.  The ALJ accomplished this by eliciting the opinion of a vocational expert.  The vocational expert opined that, given the limitations the ALJ determined the Plaintiff had, the Plaintiff could perform one of two previous occupations.").

Moreover, Plaintiff did not challenge or object to the classification of her past work as a fabric inspector and inventory audit clerk.  Nor did Plaintiff identify a DOT number that was a closer match to the jobs she performed.  Thus, Plaintiff essentially waived her argument.  *See Brock v. Comm'r of Soc. Sec.*, No. 2:22-CV-368, 2023 WL 3815229 at *4 (M.D. Fla. June 5, 2023)

(where plaintiff claimed that the real estate agent job required her to climb, contrary to the RFC, and that the VE misclassified her work as a real estate agent when it was more properly described as a real estate broker that required occasional climbing according to the DOT, the court found that because the plaintiff did not challenge the VE's alleged misclassification her argument was effectively waived); *Vickery v. Comm'r of Soc. Sec.*, No. 5:21-CV-122, 2022 WL 16555990 at *3 (M.D. Fla. Sept. 23, 2022) (finding that the ALJ was not obliged to further investigate whether plaintiff's job as a real estate agent was past relevant work where the VE specifically testified regarding plaintiff's past work as a real estate agent and where plaintiff was represented by counsel at the hearing and did not raise any issue as to whether her work as a real estate agent was past relevant work); *New v. Comm'r of Soc. Sec.*, No. 5:12-CV-211, 2013 WL 3804846 at *3 (M.D. Fla. July 8, 2013) ("[T]he Commissioner correctly notes that the Plaintiff did not raise this issue to the ALJ, nor did her attorney object to the VE's testimony identifying Plaintiff's prior work as a housekeeper as past relevant work. Unfortunately for Plaintiff, because she failed to raise this issue to the ALJ or even object to the VE's testimony, the ALJ was not obligated to specifically address the concerns—or rather, arguments—that Plaintiff now raises."); *McDaniel v. Kijakazi*, No. 22-CV-21201, 2023 WL 5510277 at *14 (S.D. Fla. Aug. 10, 2023), *report and recommendation adopted sub nom. McDaniel v. Kijakazi*, No. 1:22-CV-21201, 2023 WL 5507774 (S.D. Fla. Aug. 25, 2023) (noting that several courts have found a claimant's failure to object or raise an argument before an ALJ relative to her past relevant work forecloses the claimant's ability to raise the issue for the first time on appeal; because plaintiff "did not challenge the VE's classification of her past relevant work as file supervisor, the ALJ did not err in classifying her past work as such"); *Sheila R. v. Kijakazi*, No. 1:20-CV-04180, 2022 WL 17078098 at *5 (N.D. Ga. Mar. 3, 2022) (where plaintiff argued that the VE did not properly classify any of

plaintiff's past relevant work, the court found this argument lacking, noting, among other things, that plaintiff did not identify any DOT job number that was a closer match to the job she performed and that plaintiff's counsel did not object to the VE's classification of plaintiff's past relevant work or question the VE about his classification at the hearing); *Rivera v. Colvin*, No. 1:15-cv-146, 2016 WL 4424973 at *6 (N.D. Fla. Mar. 3, 2016), *adopted* at 2016 WL 4414792 (Aug. 18, 2016) (claimant failed to meet her burden at step four where claimant offered no evidence to rebut the ALJ's determination and where claimant's counsel had opportunity to question both claimant and VE at hearing regarding claimant's past relevant work); *Kolozs v. Comm'r of Soc. Sec.*, No. 2:22-CV-418, 2023 WL 4231630 at *6 (M.D. Fla. June 28, 2023); *Hall v. Comm'r of Soc. Sec.*, No. 6:19-CV-1066, 2020 WL 1673053 at *3 (M.D. Fla. Apr. 6, 2020) (noting that when the VE classified plaintiff's past relevant work plaintiff did not challenge that designation, did not question the VE about the designation, and did not provide evidence to rebut the designation or her ability to do that work, and that although the ALJ and VE did not ask for additional testimony, plaintiff "should have offered to provide more information after the VE found her past relevant work was dining room attendant or waiter-waitress informal" and therefore plaintiff "failed to satisfy her burden at step four to demonstrate her work experience as a banquet server, restaurant server, and lane waitress did not constitute past relevant work as a waiter-waitress informal or was not properly classified by the VE").  "Thus, without an objection or other reason to doubt [the VE's] credibility, the [VE's] experience provides substantial evidence to support the ALJ's reliance on [the VE's] testimony."    *Kolozs v. Comm'r of Soc. Sec.*, No. 2:22-CV-418, 2023 WL 4231630 at *6 (M.D. Fla. June 28, 2023) (citing *Curcio v. Comm'r of Soc. Sec.*, 386 F. App'x 924, 926

(11th Cir. 2010)).[8]

Plaintiff argues that she never worked as a fabric inspector as described in the DOT and/or as customarily performed in the national economy.  (Doc. 18 at p. 7).  Plaintiff asserts that the fabric inspector occupation, as customarily performed, does not relate to her past work as a quality control operator or as a quality control supervisor at Twitchell, with the primary difference being that the fabric inspector occupation requires the inspection of completed articles made from fabrics, while the quality control operator position at Twitchell required inspection of yarn after it had been dyed.  (*Id*.).  Plaintiff states that while both of the occupations involve inspection or examination, they are entirely different—as one involves inspection of a finished or completed garment while the other inspects yarn immediately after it has been dyed using heavy machinery. Also, they occur at two vastly different points in the garment manufacturing process and with vastly different parameters.   (*Id*.).   In support, Plaintiff submits for the first time an affidavit regarding her job functions at Twitchell (Doc. 18-1), along with an October 4, 2004 Twitchell job

---

[8] The court notes that Plaintiff, citing *Nelms v. Bowen*, 803 F.2d 1164, 1165 (11th Cir.1986), asserts that the ALJ had an affirmative duty to develop the record to determine the physical requirements of her past work but failed to do so.  (Doc. 18 at p. 8).  The Commissioner contends that if Plaintiff did not believe that work as a fabric inspector or inventory audit clerk was past relevant work, she had the burden of developing the record about her work.  (Doc. 19 at p. 5) (citing *Barnes v. Sullivan*, 932 F.2d 1356, 1359 (11th Cir. 1991) (the claimant—not the Commissioner—bears the burden of showing that certain work experience is not past relevant work)); *Marchand v. Astrue*, No. 8:11-cv-2458, 2012 WL 6733028 *3 (M.D. Fla. Dec. 28, 2012) (finding that claimant failed to show that his prior work was not past relevant work, and noting that claimant had burden of clarifying his testimony about his former work and developing the record on his employment). Plaintiff's reliance on *Nelms* is misplaced, as there the Eleventh Circuit held that where the record lacked evidence of the exertional requirements of the claimant's past relevant work, the ALJ's determination that the claimant could perform that work on the basis of an RFC for light work was unsupported.  *Id*.  Here, the ALJ had Plaintiff's work history report and Plaintiff's testimony. Additionally, the VE testified that Plaintiff's past relevant work was as an inventory audit clerk and fabric inspector, which were classified at the light exertional level, and the ALJ's RFC determination was for light work.  *See Johnson v. Colvin*, No. 5:11-CV-3493, 2013 WL 5411232 at *11 (N.D. Ala. Sept. 26, 2013).

description for the position of quality control inspector (18-2).

First, in addressing this claim of error, the court will not consider Plaintiff's affidavit and job description. *See Beard v. Berryhill*, No. 5:15-CV-01788, 2017 WL 924621 at *2 (N.D. Ala. Mar. 7, 2017). Second, the ALJ found that Plaintiff, through representation, agreed that the fabric inspector job "appeared to be the appropriate identification for past work." (Tr. 27). As discussed above, Plaintiff waived her argument by neither objecting nor presenting evidence to challenge the testimony of the VE's classification. *Curcio*, 386 F. App'x at 926. Nor does Plaintiff identify a DOT number that was a closer match to the jobs she performed. Lastly, the ALJ found that the DOT position "was entirely consistent with the light residual functional capacity assigned," as the DOT position referred "to activities such as examining, measuring, spreading, trimming, marking, folding, and stacking various fabric-crafted articles" and concluded that Plaintiff could perform the fabric inspector position as it was customarily performed. (Tr. 27). *See* DICOT 789.587-014 Inspector, Fabric, 1991 WL 681235. "A DOT occupation is appropriately analogous if it involves duties that are 'comparable' to those of the claimant's occupation, but 'not necessarily every duty.'" *McCook v. Aetna Life Ins. Co.*, No. 3:17-CV-823, 2018 WL 6983618 at *19 (M.D. Fla. Nov. 14, 2018) (citation omitted); *Green v. Reliance Standard Life Ins. Co.*, No. 408CV068, 2009 WL 1956290 at *8 (S.D. Ga. July 7, 2009) (finding that the descriptions need not be "identical," as long as the description relied upon by defendant "adequately reflect[s] the character of [plaintiff's] occupation"). Accordingly, the ALJ's classification of Plaintiff's job as a fabric inspector was supported by substantial evidence.

As to the inventory audit clerk position, Plaintiff argues that she could not do the inventory audit clerk job as actually and customarily performed because in a work report she stated that she worked 50 hours a week instead of 40 and that she performed postural activities beyond those the

17

job required according to the DOT.  (Doc. 18 at pp. 9-10).  Plaintiff also asserts that according to the DOT, the inventory audit clerk's duties include "compil[ing] data from sources, such as contracts, purchase orders, invoices, requisitions, and accounting reports" and "compar[ing] nomenclature, stock numbers, authorized substitutes, and other listed information with catalogs, manuals, stock lists, and similar references to verify accuracy of requisitions and shipping orders"—tasks that Plaintiff did not perform at Cannon Oil.  (*Id*.).  *See* DICOT 219.387-030, inventory audit clerk, 1991 WL 671981.  Plaintiff further asserts that the DOT description required no climbing, stooping, kneeling, crouching, or crawling as an inventory audit clerk but that all of these were requirements of her prior work at Cannon Oil.  (*Id*. at p. 10, citing Tr. 243).  Plaintiff also contends that demands of her previous work at Cannon Oil, as actually performed, are outside the scope of her RFC.  (*Id*.).  Plaintiff asserts that she performed her duties at Cannon Oil for 10 hours a day for 5 days a week and her previous work required at least frequent climbing, stooping, kneeling, crouching, and crawling that conflicted with her RFC, *i.e.*, a reduced range of light work that would require, at most, six hours of standing and walking[9] in an eight-hour work day and limit her to only occasional kneeling, stooping, crouching, and/or crawling.  (*Id*.).

As discussed previously, Plaintiff waived her argument in that regard.  *See Curcio*, 386 F. App'x at 926.  Nor does Plaintiff identify a DOT number that was a closer match to the jobs that she performed.  As to Plaintiff's argument that the ALJ erred by finding that she could return to her past relevant work as she actually performed it, the ALJ's decision stated that the ALJ "considered the claimant's testimony, filed work history statements, and earnings records" in determining that the inventory audit clerk position constituted past relevant work.  (Tr. 26).

---

[9] "'Light work' by definition limits the amount an individual can walk or stand for approximately six hours in an eight-hour work day."  *Carson v. Comm'r of Soc. Sec.*, 440 F. App'x 863, 864 (11th Cir. 2011) (citing SSR 83-10, 1983 WL 31251 at *6 (S.S.A. 1983)).

Although Plaintiff cites to a work history statement in which she listed working 10 hours a day for 5 days a week in the inventory audit clerk position, in another work history statement Plaintiff lists working 8 hours a day for 5 days a week in the inventory audit clerk position.  (Tr.224).  Further, the ALJ noted that Plaintiff's report of working 50 hours a week was, essentially, not consistent with the record, stating: "Per her report, the claimant averaged fifty hours a week at $12.50 an hour, therefore earning $2500 every four weeks.  This would imply $30,000 a year.  Detailed records, however, show $14,860 in 2013, $26,270 in 2014, and $13,310 in 2015."  (Tr. 26).

Moreover, the ALJ adequately explained that the DOT "entry was entirely consistent with the residual functional capacity assigned," as "[o]n her worksheet, the claimant listed '8' hours each for all walking, standing, reaching, crouching, and crawling," which was "unspecific and ambiguous."  (Tr. 27, 243).  SSR 96-8p states that "[o]rdinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 96-8p, 1996 WL 374184 at *1, 2, 7 (S.S.A. July 2, 1996).  The ALJ stated:

> The preceding narrative description suggested a typical day never involved postural activities lasting eight hours. Instead, it simply referred to counting items at a store from inventory. It was unspecific on the type or extent of kneeling, crawling, or crouching needed. Hearing testimony was also not consistent with up to eight hours of any postural activities. She testified counting inventory at 14 stores each month. The claimant's earlier reports appear to state that she could be expected to engage in postural activities from time to time *across* each eight-hour day. This testimony and written characterization appears consistent with the Dictionary entry. That entry references compiling stock data and completing accounting reports for purposes of maintaining inventory.

(Tr. 27) (emphasis in original and enhanced).

The evidence shows that Plaintiff's past relevant work as actually performed was not precluded by her RFC.  *See Dukes v. Saul*, No. 8:18-CV-2553, 2020 WL 755393 at *4 (M.D. Fla.

Feb. 14, 2020) ("[T]he ALJ relied on the VE's testimony to find that the Plaintiff's RFC allowed her to perform her past relevant work [as actually performed] as a mail clerk.  Thus, the ALJ had no duty to resolve any conflict between the VE's testimony and the DOT and the ALJ's decision is supported by substantial evidence.").  Plaintiff did not object to the VE's classification of her past relevant work or question the VE about the classification at the hearing.  The ALJ thus properly relied on the VE's testimony regarding the physical and mental demands of Plaintiff's past work.  *Simpson v. Com'r of Soc. Sec.*, 423 F. App'x 882, 884 (11th Cir. 2011);  SSR 82-61, 1982 WL 31387 at *2 ("[W]here the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it, the claimant should be found to be 'not disabled.'" ).

Moreover, even if Plaintiff could demonstrate that her RFC precluded performance of past relevant work as an inventory audit clerk as she actually performed it, she failed to prove that she could not perform the job as generally performed.  The DOT describes the position of an inventory audit clerk as follows:

> Performs **any combination** of following tasks **to compile records** concerned with ordering, receiving, **storing**, issuing, and shipping materials, supplies, and equipment: **Compiles data from sources**, such as contracts, purchase orders, invoices, requisitions, and accounting reports and writes, types, or **enters information into computer to maintain inventory**, purchasing, shipping, or **other records**. Keeps back order file in established sequence and releases back orders for issue or shipment as stock becomes available. **Compiles stock control records and information**, such as consumption rate, characteristics of items in storage, and current market conditions, **to determine stock supply** and need for replenishment. Prepares requisitions, orders, **or other documents for purchasing or requisitioning new or additional stock items**. Compares nomenclature, **stock numbers**, authorized substitutes, and **other listed information** with catalogs, manuals, parts lists, and **similar references to verify accuracy of requisitions and shipping orders**. Reviews files to determine unused items and recommends disposal of excess stock.

DICOT 219.387-030, Stock Control Clerk, 1991 WL 671981 (4th ed., rev'd 1991) (emphasis

added).

Although Plaintiff argues that she could not perform the inventory audit clerk as customarily performed because the DOT description of the inventory audit clerk job included some tasks that Plaintiff asserted that she did not perform at her job with Cannon Oil, Plaintiff was not required to perform every task in the DOT description of the occupation—as the DOT description actually states that the inventory audit clerk job involves "any combination" of the listed tasks. *See id.*   As to Plaintiff's assertion that the DOT description required no climbing, stooping, kneeling, crouching, or crawling as an inventory audit clerk, the ALJ noted that Plaintiff's narrative description of her job "suggested a typical day never involved postural activities lasting eight hours," "referred to counting items at a store from inventory," and "was unspecific on the type or extent of kneeling, crawling, or crouching needed," that the hearing testimony was "not consistent with up to eight hours of any postural activities," that Plaintiff "testified counting inventory at 14 stores each month," and that Plaintiff's "earlier reports appeared to state that she could be expected to engage in postural activities from time to time *across* each eight-hour day."  (Tr. 27, 44-45, 243) (emphasis in original).  For the reasons previously articulated, the court concludes that the ALJ properly relied on the VE's testimony and other evidence in the record in determining that Plaintiff could perform the inventory audit clerk job as customarily performed and that the ALJ's decision on this issue was supported by substantial evidence.

### B.   Sentence Six Remand

Plaintiff requests a remand under sentence six of 42 U.S.C. § 405(g) for consideration of her affidavit and an October 2004 Twitchell job description entitled "Quality Control Inspector." (Doc. 18 at p. 11).  The Commissioner contends that Plaintiff failed to show that she is entitled to a remand based on evidence and argument presented for the first time on appeal.  (Doc. 19 at

p. 10).

Sentence six of § 405(g) reads as follows:

The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g).  Under a sentence six remand, a "district court does not affirm, modify, or reverse the Secretary's decision; it does not rule in any way as to the correctness of the administrative determination." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).  Instead, "the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Id*.

To obtain a sentence-six remand, "'the claimant must establish that: (1) there is new, noncumulative evidence; (2) the evidence is material, that is, relevant and probative so that there is a reasonable possibility that it would change the administrative result, and (3) there is good cause for the failure to submit the evidence at the administrative level.'"  *Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 821 (11th Cir. 2015) (quoting *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir.1986)) (internal quotation marks omitted).  "Accordingly, sentence six encompasses only those instances in which 'the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of

that proceeding.'"  *Gordon v. Soc. Sec. Admin., Com'r*, 625 F. App'x 512, 514 (11th Cir. 2015) (citation omitted).

Plaintiff argues that she never worked as a fabric inspector as described in the DOT and/or as customarily performed in the national economy.  (Doc. 18 at p. 7).  In support, Plaintiff cites her affidavit and the 2004 position description at Twitchell.  (*Id.*).  According to her affidavit, Plaintiff worked at Twitchell Corporation as a quality control operator from March of 2005 to approximately September of 2007.  (Doc. 18-1 at ¶ 2).[10]  Plaintiff asserts that she did not "examine articles made from fabrics" as described in the DOT for a fabric inspector.  (Doc. 18 at p. 7; DICOT 789.587-014, 1991 WL 681235).  Plaintiff instead states that she lifted spools of yarn, which weighed at least thirty-five pounds, and inspected yarn produced by the heavy machines that spun and dyed the yarn.  (*Id.* at ¶¶ 3, 6, 8).  Plaintiff further states that she worked twelve-hour shifts in which she had to stand or walk at least eleven hours per shift.  (Doc. 18-1 at ¶ 4).[11]

Plaintiff asserts that the affidavit and job description are new and noncumulative (as they provide the details of her past work at Twitchell) and that they are material (as the evidence would change the ALJ's decision that she could return to her past work as a fabric inspector).  (Doc. 18 at pp. 11-12).  The Commissioner contends that this information is not new because the job description was in existence in 2004—well before these proceedings—and Plaintiff has failed to

---

[10] Plaintiff asserts that she worked as a quality control supervisor from September 2007 through 2009.  (Doc. 18 at p. 7).  However, her affidavit does not mention that she worked as a quality control supervisor from September 2007 through 2009.  (*See* Doc. 18-1).  At the ALJ hearing, Plaintiff testified that, at some point in time, she worked as a quality control supervisor.  (Tr. 45).

[11] In the section of the job description entitled "Duties and Responsibility," one responsibility of the quality control inspector is to "[r]un[] hands over the yarn to detect any defect on the surface of the yarn."  (Doc. 18-2 at p. 1).  Plaintiff cites this passage as if it were a quote from her affidavit.  (Doc. 18 at p. 7).  However, the court notes that Plaintiff does not reference the job description in her affidavit.

show that she was incapable of obtaining it before now.  (Doc. 19 at p. 11).  The Commissioner further contends, in essence, that while the affidavit may not have been in existence until now, its contents were based upon Plaintiff's own experiences and that Plaintiff has failed to demonstrate that she could not have completed the affidavit before submitting it for the first time on appeal. (*Id.*).

Plaintiff asserts that the "Eleventh Circuit has held that 'if an applicant can show good cause for his failure to introduce evidence during a hearing before the ALJ (even if the evidence was available to the applicant before the ALJ's decision) courts may consider that evidence in deciding whether the case should be remanded for further administrative proceedings to include the new evidence.'"  (Doc. 23 at pp. 6-7, citing *Falge v. Apfel*, 150 F.3d 1320, 1323-24 (11th Cir. 1998)).  Citing *Pruitt v. Astrue*, No. CIV. A. 07-0634-M, 2008 WL 801799 (S.D. Ala. Mar. 24, 2008) and *Digiovanni v. Apfel*, No. 97-245-Civ-FTM-21D, 1999 WL 33601325 (M.D. Fla. Feb. 8, 1999), Plaintiff maintains that her new and current attorney immediately obtained the evidence and submitted it as soon as practicable—even though her previous attorney may have failed to present the evidence in a timely manner.  (*Id.* at pp. 7, 8; Tr. 33).

In *Pruitt*, the court found that the evidence in question was new and not repetitive of other evidence in the record and was material to the claims asserted in the action.  2008 WL 801799 at *4.  The court found good cause for the plaintiff's failure to present the evidence earlier because, although there was no good explanation as to why the plaintiff's former attorney did not present the evidence, the court did "not wish to see the error compounded."  *Id*.  The court noted that had the plaintiff's current attorney represented the plaintiff from the beginning and neglected to present all of the information to the ALJ for his review, the court would not likely have found good cause. *Id*.  Similarly, in *Digiovanni*, the plaintiff's prior counsel could have obtained a doctor's report at

any time prior to or during in the administrative proceedings but failed to do so.   1999 WL 33601325 at *6.   However, once new counsel was retained by the plaintiff, new counsel immediately obtained the doctor's report and submitted it to the Appeals Council and the court. *Id*.   The court found that because new counsel immediately obtained the report and submitted it as soon as was practicable, the plaintiff should not be denied an opportunity for the ALJ and the Appeals Council to fairly review the case.  *Id*.

However, those cases are not helpful to Plaintiff because the evidence here is not material. As an initial matter, the ALJ did not find that Plaintiff could perform the fabric inspector job as she actually performed it.  (Tr. 27).   Further, Plaintiff's affidavit does not reference her duties as a quality control inspector as she actually performed them.   Moreover, Plaintiff fails to show the significance of the distinction between the DOT description, which involves inspection of a finished or completed garment, versus the Twitchell job, which involved the inspection of yarn immediately after it had been dyed using heavy machinery.   (Doc. 18 at p. 7).   Like the Commissioner maintains, this argument is nothing more than a distinction without a difference. (Doc. 19 at p. 7).   As the court previously has discussed, the ALJ's classification of the fabric inspector position as Plaintiff's past relevant work and determination that Plaintiff could perform that position as customarily performed were both based on substantial evidence.   Moreover, even if the ALJ erred in finding that Plaintiff could perform the job of fabric inspector as it is customarily performed, the court previously found that the ALJ's determination that Plaintiff could perform the job of inventory audit clerk as it is actually and customarily performed was based on substantial evidence.   The affidavit and job description do not change those conclusions.   Accordingly, Plaintiff's request for a sentence six remand is denied.

### C.        Application of the Pain Standard

Plaintiff essentially argues that because there is evidence, both cited and overlooked by the ALJ, of herniated discs, disc displacement, and positive indication of Cervical Radiculopathy, she was necessarily disabled.  (Doc. 18 at pp. 14-15).

In determining whether a claimant is disabled, the claimant's symptoms, including pain, are considered to the extent that they are reasonably consistent with objective medical evidence and other evidence.  20 C.F.R. §§ 404.1529(a), 416.929(a).  The Commissioner will consider a claimant's statements about his or her symptoms and any description that claimant's medical sources or nonmedical sources may provide about how the symptoms affect the claimant's activities of daily living and ability to work.  *Id*.  However, a claimant's statements about pain or symptoms alone are not enough to establish the existence of a physical or mental impairment or disability.  *Id*.; SSR 16-3p, 2017 WL 5180304 at *2 (S.S.A. Oct. 25, 2017); *Turner v. Kijakazi*, No. 1:19-CV-774, 2021 WL 3276596 at *9 (M.D. Ala. July 30, 2021) ("[A]n ALJ is not required to accept a claimant's subjective allegations of pain or symptoms.").  The regulations set out a two-step process for the evaluation of subjective complaints.  *Id*.; SSR 16-3p, 2017 WL 5180304 at *3.  To establish a disability based on testimony of symptoms, the claimant must provide evidence of an underlying medical condition and either (1) objective medical evidence confirming the severity of the alleged symptoms, or (2) evidence establishing that the objectively determined medical condition could be reasonably expected to give rise to the alleged symptoms.  *Carroll v. Soc. Sec. Admin., Comm'r*, No. 6:21-CV-00014, 2022 WL 3718503 at *12 (N.D. Ala. Aug. 29, 2022) (citing *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002)); 20 C.F.R. §§ 404.1529(a)-(b), 416.929(a)-(b); SSR 16-3p, 2017 WL 5180304 at *3.

"Consideration of a claimant's symptoms therefore involves a two-step process, wherein the SSA first considers whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the claimant's symptoms, such as pain." *Mixon v. Kijakazi*, No. 8:20-CV-2991, 2022 WL 2816964 at *3 (M.D. Fla. July 19, 2022); 20 C.F.R. §§ 404.1529(a)-(b), 416.929(a)-(b); SSR 16-3p, 2017 WL 5180304 at *2-3.  Once an underlying physical or mental impairment that could reasonably be expected to produce the claimant's symptoms is established, the ALJ must then consider all of the evidence in the record to evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's capacity for work.  SSR 16-3p, 2017 WL 5180304 at *3-4; 20 C.F.R. §§ 404.1529(a)-(c), 416.929(a)-(c); *Stromgren v. Kijakazi*, No. 3:21-CV-908, 2022 WL 1205347 at *5 (N.D. Fla. Mar. 11, 2022), *report and recommendation adopted*, No. 3:21-CV-908, 2022 WL 1204519 (N.D. Fla. Apr. 22, 2022).  In doing so, SSR 16-3p and the regulations require an ALJ to consider certain factors, including: (1) daily activities; (2) location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken; (5) treatment, other than medication, to relieve pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) any other factors concerning functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2017 WL 5180304 at *8-9; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ will also consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between claimant's statements and the rest of the evidence, including the history, signs and laboratory findings, and statements by treating and non-treating sources or other persons about how the symptoms affect the claimant.   20 C.F.R.   §§

404.1529(c)(4), 416.929(c)(4).  "However, Eleventh Circuit case law does not require an ALJ to enumerate every factor in every decision." *Alexander v. Comm'r of Soc. Sec. Admin.*, No. 6:20-CV-01862, 2022 WL 4291335 at *5 (N.D. Ala. Sept. 16, 2022) (citing *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995) (concluding that the ALJ need not cite to "particular phrases or formulations" but must provide reasons that would enable a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole)).  If the ALJ discredits a claimant's subjective statements, the ALJ "must articulate explicit and adequate reasons for doing so." *Foote*, 67 F.3d at 1561-62; *Patterson v. Kijakazi*, No. 8:21-CV-359, 2022 WL 3028058 at *3 (M.D. Fla. Aug. 1, 2022).  That is, "[w]here proof of a disability is based upon subjective evidence and a credibility determination is a critical factor in the decision, if the ALJ discredits the claimant's testimony as to his subjective symptoms, the ALJ must either explicitly discredit such testimony or the implication from the ALJ's opinion must be so clear as to amount to a specific credibility finding." *Martinez v. Comm'r of Soc. Sec.*, No. 21-12116, 2022 WL 1531582 at *2 (11th Cir. May 16, 2022) (citing *Foote*, 67 F.3d at 1562).  "Subjective complaint credibility is the province of the ALJ." *Williams v. Kijakazi*, No. 2:20-CV-277, 2022 WL 736260 at *2 (M.D. Ala. Mar. 10, 2022) (citing *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014)).

Here, the record reflects that the ALJ sufficiently addressed Plaintiff's subjective statements in accordance with the regulations.  The ALJ considered the entire medical record in evaluating Plaintiff's subjective statements.  The ALJ's decision provides, in relevant part, the following:

> The claimant describes a number of activities generally consistent with those of a stay at home parent/grandparent and homemaker. She can care for herself, prep simple meals, clean, socialize on the telephone, attend church, and participate in errands. She can care for her pet dog and tend to her grandson's needs. Despite these admissions, she alleges significant compromises in exertion, persistence, and reliability. She needs extensive periods of rest in between all activities. Longer

activities require intermittent breaks at will. She struggles to perform activities requiring extensive balancing, standing, bending, kneeling, or crouching. She sometimes ambulates with a cane. She often accepts help from friends and family. She has trouble remembering to take medication at times, but is able to program reminders onto her phone. She admits she can follow instructions, but does not handle stress or extended interpersonal activities well (Exhibit B3E).

On appeal, she denied improvement or significant changes in functioning. She also stated she was not taking any medications, but this appeared inconsistent with her other statements and the contemporary medical evidence (Exhibit B8E). In June, she reported taking antidepressants, anxiolytics, muscle relaxers, bronchodilators, acid reducers, NSAIDs, and Lyrica (Exhibit B12E). She later alleged also taking diuretics, antidiabetics. She reported cervical and thoracic degenerative disc disease, bipolar disorder, mixed anxiety and depressive disorder, incontinence, hyperglycemia, type two diabetes, COPD, and osteoarthritis (Exhibit B14E).
…
To better understand the intensity, persistence, and limiting effects of the claimant's alleged symptoms, the undersigned carefully considered the third party statement from Ms. Rochelle Lambert. This source tended to corroborate the claimant's allegations, but admitted she knew little directly about the claimant's daily activities. Objectively, the source did note the claimant's complaints of pain had increased in frequency. This statement was largely unsupported and uncritical repetition of the claimant's allegations (Exhibit B5E).

Much of the record upon which the claimant relies has already been fully considered in a prior decision, administratively final. The claimant previously focused on her back and knee pain, status post 2015 and 2016 injuries. She twisted her knee in 2015, with x-ray showing early degenerative changes. She nonetheless returned to work, continuing to allege some pain. In 2016, she fell from a ladder. This caused a "small" C3 anterior inferior chip fracture and "mild" compression fractures at T9 and T11. She stabilized and was released on medication. Alignment was already excellent by follow up, and tenderness only mild in the cervical spine. The fractures have remained mended despite proximate degenerative disc disease noted later in the record. Later visits showed "subtle" ataxia and muted reflexes (Exhibit B1F). Complaints of pain continued, but pain therapies and medications remained conservative. Meclizine was added due to reports of vertigo and dizziness. Episodes were brief and medication was effective (Exhibit B3F). Follow up cervical MRI was not severe. She reported worsening knee pain and new MRI showed severe osteoarthritic changes and degenerative multisite meniscal tearing (Exhibit B3F, 20). She underwent surgery on her torn meniscus in May 2018, noted as doing "very good" on follow up. She alleged vertigo when bending or looking upward.

She extensively smoked cigarettes during this prior period, and alleged respiratory disease requiring breathing treatments four times a day. FEV ratio was 52 percent in February 2017 spirometry. Chest imaging was normal. 2017 was silent for acute

exacerbations. Early 2018 exacerbations failed to produced remarkable exam findings or alter her conservative treatment regimen. Continued smoking did not result in proportionate quantifiable worsening in pulmonary functioning.

Obesity was noted, with BMI at 45.6. Obesity may cause *increased* functional limitations. It may cause new functional limitations due to increased stress on the musculoskeletal system. Examples may be exertional, postural, manipulative, environmental, and even mental. The undersigned has considered, consistent with SSR 19-2p, the exacerbating effect of the claimant's condition on her other impairments (20 CFR 404.1545 and 416.945). The residual functional capacity fully contemplates and accommodates this effect. The medical evidence of record and claimant testimony suggest some exacerbation of the limitations stemming from her back impairment. This further supports a limitation in the claimant's exertional requirements for walking, lifting, sitting, and standing to a light level. The claimant emphasizes her cane now. The cane also appeared at the last hearing. She testified it had been used since 2016. It was actually generally absent in the treatment record during that period, and gait was regularly unremarkable.

Sections of the current record overlap with the period already adjudicated (Exhibits B1F-BF). The claimant saw Dr. Farouk Khan at Southeast Acute & Primary Care Clinic in August 2017. MRI at the time showed the cervical spondylosis and facet arthropathy, mild superior endplate deformities at T9 and T11, lumbosacral degenerative joint disease, and bilateral knee problems (Exhibits B1F, 2; and B2F, 2-3). MRI was described as of somewhat "poor quality" due to motion artifact (Exhibit B3F, 11). All musculoskeletal impairments caused pain to some degree. Save for back exams, physical examinations were normal. Focus during this period was often mental, discussed above.

…

She continued to report left knee pain to the end of 2017. She reported this pain was similar to that which occurred whenever her "arthritis breaks out". There was associated left knee edema (Exhibit B2F, 8-15). Into 2018, she had a past medical history of diabetes, COPD, arthritis, anxiety, and depression (Exhibit B3F, 19). However, on filing she alleged only prediabetes. As noted in the prior decision, she underwent meniscal repair of the left knee (Exhibit B3F). She reported doing well, "90%" better, by June 2018 (Exhibit B3F, 14). Anti-inflammatory and Norco were effective. Epidurals had been partially effective in the cervical and thoracic spine. Lumbar flexion was limited to 80 and extension to 20. This was essentially normal. Neck extension reached 20 degrees (abnormally reduced), rotation seventy (mildly reduced). Shoulder rotation was 30 degrees externally (abnormally reduced) and 90 degrees internally, bilateral (normal). Strength, sensation, and reflex were all normal. There was no swelling or edema. During the same period she was treated for COPD with ProAir and Dulera.

Six days before her July 2018 hearing, the claimant was still on the same medication regimen. She reported doing home therapy and making progress. She reported left

shoulder and neck pain, describing a popping sensation. This had bothered her earlier but was not as pressing as the knee pain. Areas of most concern had changed. She denied most limiting symptoms, such as shortness of breath, difficulty walking, weakness, confusion, gait dysfunction, or headaches (Exhibits B3F, 5; and B7F, 16). There was limited strength on left rotator cuff testing, but otherwise normal strength in both upper extremities. There was pain on rotation of the shoulder, and impingement signs to the left. Imaging showed only mild acromioclavicular arthritic change. Cervical neck imaging was normal. She was given a local injection.

As of November 2018, she was still seeing NP Carter, emphasizing her COPD. She alleged coughing and shortness of breath, but conceded breathing much better with her inhalers. NP Carter did not document any overt signs of breathing compromise. She reported taking custody of a newborn and five year old child, in addition to her other responsibilities (Exhibit B4F, 4). This implies additional activities of daily living, but is unaccompanied by proportionally worsening signs of limitation. She had also lost her home due to the recent hurricane (Exhibit B4F). She reported continued back pain, muscle aches, fatigue, and irritability. She denied many of the symptoms she now emphasizes, such as headaches, weakness, dizziness, vertigo, or exercise intolerance. Physical and mental exams remained entirely normal, save losses in motor strength, tenderness and limited range of motion. Gait, station, respiration, ambulation, memory, and concentration were all normal. Bloodwork, however, revealed above high normal hemoglobin at 16.2 and glucose at 120. Medications included continued Abilify, Buspar, Lyrica, Trulicity, bronchodilators, acid reducers, and muscle relaxers.

She reportedly ran out of medication shortly thereafter, in January 2019 (Exhibit B6F, 17). This did not result in rapid functional deterioration.

In February 2019, the claimant reported to Flowers Hospital in Dothan due to reported swelling and pain in the right knee. Similar to the opposite knee's trauma 2015, this was a twisting injury while taking out the trash. While the claimant was injured in the act, the undersigned notes that such an activity implies routine chores on some level. Respiratory, cardiac, mental, and neurological exams were normal. There was tenderness, swelling, and restricted range of motion in the right knee. Musculoskeletal exam was otherwise normal. Imaging showed up to moderate tricompartmental right knee osteoarthritis. She was discharged with Norco and instructed to follow up with primary care and orthopedic specialists (Exhibit B5F). Medications otherwise remained stable and signs of poor control among her chronic impairments were lacking. This continued to undercut support for changes to her light residual functional capacity. On follow up, she alleged extreme right knee pain and no help from local injection therapy. She alleged she could walk no more than five feet without being extremely short of breath. She still managed to smoke a pack of cigarettes every day. Despite her extreme allegations of poor respiratory health, respiratory exam was entirely normal. Cardiovascular exam was normal. Musculoskeletal exam was more consistent with allegations. There was tenderness,

limited range of motion, bony deformity, strength loss, effusion, and crepitus at the right knee. She again requested a pain management referral and was again redirected by her physician. He opined that she "does not need to go on chronic opiate therapy based on her COPD and her morbid obesity". He added Spiriva for the COPD and urged her to contact the tobacco dependence hotline for Chantix. She applied for skilled nursing care through The Bureau of Home and Community Services to assist with diabetes and COPD management. Dr. Hovey endorsed the request. She had been partially compliant with glucometer checks, medication compliance, and dieting. She reported being homebound, partially due to transportation issues, and partially due to symptoms (Exhibit B6F). A cane was recommended by her monitoring nurse. There was no indication that this was an assessment of her permanent functioning. The source had only a short-term treating relationship with the claimant. The recommendation was not endorsed by other sources. This source did not provide other functional recommendations consistent with long-term reliance on a cane for ambulation. Activities were "as tolerated". This is unpersuasive for purposes of a residual functional capacity.

While functioning had decreased during this period, treatment/therapeutic life change compliance was middling. She was still smoking, had repeatedly run out of medication, was not dieting, was not exercising, and required nurse assistance. Given her normal mental status exams and steady treatment plan for anxiety and depression, there was little indication those impairments were to blame. This period of the record does not typify the claimant's functioning from November 2018 to the drafting of this decision.

As of March 2019, the claimant had developed facial periodontitis. By follow up, swelling had improved and she was focused on an upper respiratory problem and abdominal pain. Signs were consistent with gallbladder inflammation. Breathing was back at baseline. She wanted a pain management referral due to continued low back pain and knee pain. She was counseled extensively that her serious *tobacco habit* was a source of her pain exacerbation. She continued to receive advice to pursue therapeutic lifestyle changes. There were no new signs or symptoms consistent with bipolar disorder, COPD, diabetes, or fibromyalgia.

After continued knee pain and swelling, imaging revealed a meniscal tear to the right and signs of advanced patellofemoral arthritis. She underwent scoping in April 2019, receiving meniscectomy, recovering well within two weeks (Exhibit B7F). Physical exam contradicted her self-characterization from months prior. Instead of depression, affect was pleasant. She reported neck pain, which she said was worsening and causing morning tingling in the upper limbs. Strength and sensation was still normal. There was pain on range of motion and positive bilateral Spurling's maneuver. Unlike with many of her more noncritical exams, CRNP Cidney Meritt diagnosed cervicalgia only after this extensive physical exam and imaging. The claimant was scheduled for physical therapy. Rather than stating she could only walk five steps before exhaustion, she now alleged "some soreness after walking on [the limb] for long periods of time". On exam, she exhibited good range

of motion in the knee and no local tenderness. There was no reference to COPD, though she was still smoking. This shift was far closer to her baseline and supports the light residual functional capacity assigned.

She alleged continuing upper back and knee pain. June 2019 MRI of the spine showed minimal disk bulging at C5-C6, a benign C7 hemangioma, mild wedging and endplate herniation in the thoracic spine, and otherwise no issues. This was identical to imaging in 2017 prior to her last unfavorable petition (Exhibit B8F). She reported NSAIDs and pain medication were effective (Exhibit B8F, 6). She conceded her weight was an issue, but stated her inability to exercise had stymied efforts to lose it. Physical exam was again normal, save for some neck pain on range of motion.

She underwent cervical injection in August and October 2019. This was only partially effective. Cervical range of motion remained decreased and the area was tender. This continued to appear disproportionate to the more subtle and mild MRI evidence ("completely normal") (Exhibit B9F, 30). She reported difficulty walking and loss of balance, but ambulation, gait, station, and respiration were all normal. Other medications remained similar. She continued to take muscle relaxers, diuretics, NSAIDs, Lyrica, and tramadol. COPD remained controlled with bronchodilators. Mild diabetic-type symptoms were controlled with metformin and antispasmodics.

(Tr. 20-25).

An ALJ "is not required to specifically address every aspect of an opinion or every piece of evidence in the record" in order for the determination to be affirmed. *Coley v. Comm'r of Soc. Sec.*, 771 F. App'x 913, 917 (11th Cir. 2019); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision ... is not a broad rejection which is 'not enough to enable [the district court ... ] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole.'") (citation omitted). Here, the ALJ's decision reflects that the ALJ thoroughly addressed Plaintiff's subjective statements in accordance with 20 C.F.R. §§ 404.1529(c)(1)-(4), 416.929(c)(1)(4). The ALJ considered the entire record in evaluating Plaintiff's subjective statements and carefully detailed the medical proof used in finding that Plaintiff's statements were not entirely consistent with the medical evidence. *See Bloodworth v.*

*Kijakazi*, No. 3:21-CV-120, 2023 WL 2242313 at *5-6 (M.D. Ala. Feb. 27, 2023) (noting the ALJ's exhaustive review of plaintiff's testimony and her medical records, the court found that the ALJ properly evaluated the plaintiff's subjective complaints, as the ALJ explicitly discussed the "objective medical evidence," plaintiff's "treatment history," plaintiff's "response to medication," and plaintiff's "daily activities," and that substantial evidence supported the ALJ's treatment of plaintiff's subjective testimony given that plaintiff's complaints were not consistent with the evidence as a whole); *Hilton v. Kijakazi*, No. 2:20-CV-521, 2022 WL 1262550 at *4 (M.D. Ala. Apr. 28, 2022) (where the ALJ relied on objective medical evidence, medical opinions, and plaintiff's daily activities in discounting plaintiff's subjective symptom testimony, the court found that these reasons were consistent with and supported by the record and therefore provided substantial evidence to discount plaintiff's subjective symptom testimony).

"[A]n ALJ is not required to accept a claimant's subjective allegations of pain or symptoms." *Turner*, 2021 WL 3276596 at *9; 20 C.F.R. § 404.1529(a) ("[S]tatements about [a claimant's] pain or other symptoms will not alone establish that [a claimant is] disabled."). As explained above, the court finds that the ALJ properly evaluated Plaintiff's subjective complaints in light of the evidence of record. The ALJ sufficiently cited evidence in the record for finding that Plaintiff's statements were not entirely consistent with the record as a whole. *See Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011) (footnote omitted) (The appropriate question for a reviewing court "is not ... whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it."). Credibility determinations are the province of the ALJ and will not be disturbed by a clearly articulated credibility finding supported by substantial evidence. *Mitchell*, 771 F.3d at 782. "To the extent Plaintiff disagrees with the ALJ's interpretation of th[e] evidence, that is not a ground for remand."

*Horne v. Comm'r of Soc. Sec.*, No. 2:20-CV-181, 2021 WL 3023679 at *5 (M.D. Fla. June 28, 2021), *report and recommendation adopted*, No. 2:20-CV- 181, 2021 WL 3022727 (M.D. Fla. July 16, 2021) (citing *Sarria v. Comm'r of Soc. Sec.*, 579 F. App'x 722, 724 (11th Cir. 2014)); *Mitchell*, 771 F.3d at 782 ("'We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner.' 'If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it.'") (citations omitted).   Accordingly, the court finds that the ALJ's evaluation of Plaintiff's subjective statements and the application of the pain standard were supported by substantial evidence.

## V.     Conclusion

After carefully and independently reviewing the record, and for the reasons stated above, the court concludes as follows:

- that Plaintiff's motion for summary judgment (Doc. 18) is due to be **DENIED**;

- that the Commissioner's motion for summary judgment (Doc. 19) is due to be **GRANTED**; and

- that the Commissioner's decision is due to be **AFFIRMED**.

A separate judgment will issue.

**DONE** this the 29th day of September 2023.

_____
**CHAD W. BRYAN**
**UNITED STATES MAGISTRATE JUDGE**